### JOSEPH COLLINS et al. v. W. N. SHERMAN.

1. CORPORATIONS: TURNPIKE COMPANIES: INJUNCTIONS AGAINST.—It is no ground for restraining a company from using their franchises, under a charter authorizing them to build a turnpike and establish a ferry, that they have located their road so near to the road of another company which had been previously built under a

charter granted for that purpose, that persons travelling the former might commit a trespass on the latter by travelling on it without paying toll.

2. CORPORATIONS : EXCLUSIVE PRIVILEGES NOT PRESUMED.—Exclusive privileges in grants to corporations cannot be founded on implication ;—they can claim nothing which is not specified in the grant, or embraced in its spirit.

3. SAME.—The retention of power in the State is for the benefit of the public, to be exercised to that end, whenever the State may deem it expedient; and therefore, she is never to be held to be precluded from its exercise, except by a plain and manifest intention to surrender it, expressed in the grant.

4. SAME.—Unless there be an express grant in the charter of a turnpike and ferry company of an exclusive right to establish a ferry and turnpike on a particular river, and on a particular line of travel, the legislature may afterwards incorporate another, and authorize it to establish a turnpike and ferry on the same river, and on the same line of travel, although the establishment of the latter may materially impair the value of the franchise granted to the former.

5. SAME.—That the legislature in granting a charter to a turnpike and ferry company, required of them to keep in good repair the improvements made thereunder, is no ground for inferring a grant of an exclusive privilege to the company to make such improvements over that particular stream on the same line of travel.

IN error from the Chancery Court of Yalobusha county. Hon. W. L. Harris, chancellor.

*F. M. Aldridge*, for plaintiff in error.

This is a bill filed by William N. Sherman in the court below, alleging that he is the owner of two ferries and turnpikes, at Grenada, Yalobusha county, across the river and swamp.

The bill refers to the acts of incorporation, under which grants he claims his rights. It is charged in the bill that Joseph Collins, and others, have also established a ferry and turnpike across said river and swamp, under two acts of incorporation by the legislature, made subsequent to the grants to Sherman, which acts are specifically referred to in the bill.

An injunction is prayed, upon the ground :

1. That there was no necessity of the grant to Collins and others, because the ferries and turnpikes already established were sufficient for all the wants of the public.

2. That the grant to Collins and others of their franchise, interferes with his enjoyment of his franchise, and that the legislature had no power to make the grant.

Collins et al. *v.* Sherman.

3. It is alleged in the bill, that the charter of Collins and others, was obtained from the legislature by fraud, &c., &c.

Defendants, in the court below, answered as to the fraud, denying it, and demurred to the bill, all the charters appearing in the bill. This raises two questions :

1. Whether the legislature or the courts are the judges of the necessity of an act of incorporation, or whether the opinion of the legislature, as to the necessity may be reviewed by a court.

2. Whether the act of the legislature establishing the " Grenada Turnpike and Ferry Company," approved March 8th, 1852, p. 294 ; and the act amendatory of this act, approved March 11th, 1856, are void, under the 10th section of 1st article of Constitution of the United States, which prohibits a State from passing any law impairing the obligation of contracts.

3. That the charter was obtained by fraud from the legislature, and the act on part of the bill showing its falsity—we do not propose to notice, it being denied by answer.

We will consider these questions in the order presented here. Neither of them, that we are aware of, have ever been adjudicated by this court, though they are by no means new questions to the courts of many of the States, or to the Supreme Court of the United States :

1. The organization of the government into separate, distinct co-ordinate branches, legislative, judicial and executive, each with separate and distinct powers, would seem to dispose of this question. The legislative department of the government, is supreme, except when it is controlled by constitutional restrictions or limitations, and perhaps by the nature and purpose of its office—for the nature of society and purposes of government may prescribe limits to legislative power. All the law-making power is vested in the legislature, and they are the judges of the necessity of its exercise, and the courts construe their acts, when exercised within their power, and declare them void, when exercised beyond their powers, *but they never investigate the policy or necessity of their action* by declaring there was no necessity for the enactment of a law.

Such certainly is the general rule, and we can see no grounds

of exception in laws of the character under consideration. In the grant of a charter to a turnpike and ferry company, the State through its representatives, exercises one of its attributes of sovereignty—its right of *eminent domain*—and gives to a citizen or citizens incorporated the power to execute and enforce this right, as its agent, for the public good.

Any other position than this, would be to assume that the legislature could pass a Statute of Frauds and Perjuries, and determine the necessity of the act; but when they exercised one of the highest powers, inherent to governments, they are not the judges of the necessity of the law, although the law was not in violation of any constitutional provision, or beyond the sphere of legislative action. The violation of any constitutional provision, it will be seen is a different question, the determination of which properly pertains to the judicial department of the government.

The right of regulating and keeping in repair roads, bridges, and ferries, &c., &c., is coeval with the institution of government, and the exercise of this power is necessarily vested in the law-making department of government. *Dyer* v. *Tuscaloosa Bridge Company*, 2 Porter, 303; Vattel, Book 1st, chap. 20, § 249.

"It is for the legislature, and the legislature alone, to judge of the expediency of the exercise of any of its acknowledged powers, in any given case." *People* v. *Saratoga & Rensselœr R. R. Company*, 15 Wend. 132; 7 Pick. 466; 2 Kent, Com. 340; 5 Johns. Rep. 110; 7 Pick, 513; 6 Barn. & Cres. 365.

2. We come now to the consideration of the second question, which is the main question involved in this cause. Does the act of the legislature by which Collins and others exercised certain privileges, impair the obligation of a contract between the State and Sherman, the defendant in error?

It is not contended by the defendants in error, that there is any *express grant of exclusive privileges* in his acts of incorporation, or that he has or will sustain any damages, by the action of plaintiff in error, under his charter, except *consequential damages*. Nor is it contended by him, that plaintiff in error occupies, or is authorized by his charter to occupy, one inch or foot of soil necessary to him in the enjoyment of his franchise.

Collins et al. *v.* Sherman.

How then does the grant to Collins impair the right or grant to Sherman? The legislature has not been so unwise, if they had the power, as to grant a monopoly of the ferry business to Sherman, of the Yalobusha river.

From whence then is derived exclusive rights? By implication!

Let us then see what will pass in a grant of this character by implication :—

The principle is well recognized both in England and in this country, that in grants by the public, *nothing passes by implication.* *Proprietors of Stour Bridge Canal* v. *Wheeley et al.,* 2 B. & A. 793. In the case of *The United States* v. *Arredondo,* the leading cases upon this subject are collected, and this principle fully recognized. The question is fully argued by Chief Justice Taney, in the case of *Charles River Bridge* v. *Warren Bridge,* 11 Peters, 545. After having shown such was the English rule, he says :—

"Borrowing, as we have done, our system of jurisprudence from the English law, and having adopted in every other case, civil and criminal, its rules for the construction of statutes, is there anything in our local situation or in the nature of our political institutions, which should lead us to depart from these principles where corporations are concerned? Are we to apply to acts of incorporation a rule of construction differing from that of the English law, and by implication make the terms of a charter in one of the States more unfavorable to the public than upon an act of parliament framed in the same words, would be sanctioned by an English court? Can any reason be assigned for excepting this particular class of cases from the operation of the general principle; and for introducing a new and adverse rule of construction in favor of corporations, while we adopt and adhere to the rules of construction known to the English common law, in every other case, without exception? We think not; and it would present a singular spectacle, if, while the courts in England are restraining, within the *strictest limits, the spirit of monopoly* and exclusive privileges in nature of monopolies, and confining corporations to the privileges plainly given to them in their charter; the courts of this country should

be found enlarging these privileges by implication, and construing a statute more unfavorably to the public, and to the rights of the community, than would be done in a like case in an English court of justice."

It would seem then, if no powers can be implied, and no restriction appears in the charter, that there can be no question as to the power of the legislature to make a grant to plaintiff in error, similar to that made to the defendants in error, and that the first grant of a charter to keep up a ferry and turnpike does not confer exclusive privileges, and there is no constitutional obligation upon the legislature, not to grant to a second corporation the right to erect another bridge, or ferry, or turnpike for a similar purpose, to be constructed so near the former as greatly to impair the value of the former, and this without making any compensation for consequential injury.    *White River Turnpike Co.* v. *Vermont Central Railroad Co.*, 1 American Railway Cases, 233 ; 21 Vermont, 590; *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 545; *Dyer* v. *Tuscaloosa Bridge Co.*, 2 Porter, 296; *Enfield Toll Bridge Co.* v. *Hartford & New Haven Railroad Co.*, 17 Conn. R. ; *The Mohawk Bridge Co.* v. *Utica & Schenectady Railroad Co.*, 6 Paige, 554; *Armington* v. *Burnet et al.*, 15 Vermont, 745; *People* v. *Saratoga & Renssalœr Railroad Co.*, 15 Wend. 114; *Backus* v. *Lebanon*, 11 N. H. Rep. 20 ; in all of which authorities this principle is fully recognized and maintained.

In the case of the Tuscaloosa Bridge Company, the bridge was built immediately adjoining the ferry, and one of its abutments placed on one of the banks of the river, on the place used for a landing place, so as to destroy the ferry.    The court admit, in this case, that a ferry is a franchise.    They draw a distinction, however, between franchises granted to companies for *valuable* consideration and for a public use.    Ferries are for public use, and the grant of the franchise of keeping them based upon no valuable consideration, but for public use, and are taken subject to this general purpose; subject to the contingency of becoming worthless, as other property.

In the case of the *Enfield Toll Bridge Co.* v. *Hartfort & New Haven Railroad Co.*, 17 Conn. Rep. 454, there was a stipulation

Collins et al. v. Sherman.

in the charter of the bridge company, "that no person or persons shall have liberty to erect another bridge anywhere between the north line of Enfield and the south line of Windsor." Yet the court held, that "this was not a covenant distinct from the franchise, but identical with it, and subject to the same laws."

In the case of *Backus* v. *Lebanon*, a turnpike incorporated by the legislature of the State, was appropriated by a corporation subsequently incorporated and used in the construction of a free road. In this case, however, the damages being *direct* by the appropriation of property, and not *consequential*, resulting from competition, the public paid for the road.

Had the franchise of defendants in error itself been used by the new franchise, it would have been within the legitimate power of the legislature, if they are the judges of the necessity of the exercise of their powers. It is argued, " that such a grant, when once made to a private corporation, is irrevocable and inviolable. No doubt is it just as much so, and no more, than was the original grant of the land." All land is held in fee from the sovereign, having once constituted a part of the public domain. The land is purchased by the citizen from the State, for a valuable consideration. A franchise is usually a gift by the State to some person, natural or artificial. Why then should there be any distinction made against a purchaser, for valuable consideration, in favor of a donee? "Both classes of grants," say the court, in the case of *Armington* v. *Burnet*, "are always understood to be made subject to those reserved rights in the State which are indispensable to State sovereignty." 15 Ver. 745. See also, *The Piscataqua Bridge Co.* v. *New Hampshire Bridge Co.*, 7 N. H. Rep. 35 ; *Barber* v. *Anderson*, 8 Ib. 398 ; *Boston Water Power Co.* v. *Boston & Worchester Railroad Co.*, 16 Pick, 87 ; *Ashley* v. *Eastern Railroad Co.*, 4 Metcalf, 371.

In this case, however, there is no use or appropriation by the plaintiffs in error of defendant's franchise. Here the State does not exercise this power, but in its discretion charters a rival company, which does not appropriate one foot of the soil of the company first incorporated, but exercises a similar right granted them by the legislature in accordance with the wants of a growing com-

munity, which results in consequential damages to the first company.

It may be questioned whether a State would have the power to do directly, that which the defendants in error insist has been done by *implication*.    We have already seen if it had been done—if an express section had been in the charter granting exclusive privileges—that it would be a part of the franchise, and identical with it and subject to the same laws.    17 Conn. 454.

Can a legislature, by a charter which excludes competition, restrain, direct, or control the action of a subsequent legislature ?    In some cases it may be done.    It may exempt certain property from taxation, but this is done upon the principle that the amount is received in gross, which was due by instalments.    The same is true of the property of rail-roads, banks, institutions of learning, &c., &c.    Such grants, however, do not abridge the necessary powers of government.    The State must be defended in cases of invasion, and facilities of travel, one of the objects of government, must be provided for.    Banks, &c., stand upon a different basis, not being indispensable to government.

The power of granting such a franchise as a ferry or turnpike, to any person or persons, is exercised from the right of *eminent domain* in the State.    It is over and above all private rights—a right inherent to the State for the public good.    It is in the nature of a natural right, (if such an expression may be used in relation to society,) by virtue of which the property of one person may be appropriated to the State.    It is a power inherent to the social system, as the natural right to the individual to slay in self-defence, or to destroy private property to prevent the spread of a conflagration.    It is the highest exercise of the attribute of sovereignty. and it is beyond the power of one legislature to *retail* its sovereignty, so as to divest itself of it, and restrain or control a subsequent legislature.    The highest attribute of the State is not the subject-matter of contract.    If so, the supreme power of the State would not be vested in the State or any of its branches of government, or the people, but in ferry corporations.

In the case of *Backus* v. *Lebanon,* the court says : " Had the charter contained an express stipulation that the property of the

corporation should never be taken in the exercise of the power of eminent domain, the question would have at once arisen, whether it was competent for any legislature to make a contract of that character,—whether any legislature has authority by contract to lay restrictions upon this power. We have already had occasion to indicate a pretty strong impression upon that subject, and it is only necessary at this time to say, that we have as yet seen no reason to change the views heretofore suggested. See also 7 N. H. Rep. 69; 10 Ib. 138."

In this case, however, it is insisted that the legislature has by *implication* done an act when it is doubtful if they had the power to *do the act directly*. If the direct exercise of the power is involved in doubt, it cannot be assumed to have been done by implication.

What does the presumption of the exercise of this power by *implication* assume? It assumes that if the State grants a franchise of a ferry, that the grant is exclusive—that it is a contract and inviolable. The State thereby not only contracts that it will not exercise the power of eminent domain *over that franchise, but that it will not exercise that right anywhere in the vicinity of the ferry, so that remote consequential damages could possibly be sustained by it*. It is an *alienation* of the right of *eminent domain* not only to the land used for the purposes of the ferry, but to an unlimited extent of country, up and down the stream, so far as the corporation may spread its interests. If the right of eminent domain is quit-claimed by the State to individuals without any bounds except such as an all-grasping avarice defines, then no other road could ever cross a stream on which one of these youthful monopolies had located itself. But we have already seen nothing passes by implication—that the *franchise itself* is subject to be appropriated by the State, at all times, and in some instances where there was an express clause, in the charter, of exclusion. How then can the corporation of the plaintiffs below claim not only exemption for itself but for twenty miles about it?

The law fixes some limit to the extent of the franchise granted to the first incorporators. What limit can it fix except to the soil used by it in the enjoyment of its privileges? A ferry and turn-

pike located five miles below Grenada, would injure the ferry at Grenada, say, for illustration, five hundred dollars annually. If the right of eminent domain has been ceded by the State to Sherman, (the defendant in error,) so far as the exercise of the right would injure his grant, then the establishing of a ferry there would injure him and violate his rights. In this way there could be but one ferry on one stream. The ferry on the Mississippi river at Rodney is injurious to the ferry at Vicksburg, because if there could be no crossing at Rodney, the travel must go to other points. It is not the amount of damages sustained that entitles a plaintiff to an action, but it is the violation of a right, whether small or great—it is damage to the extent of one cent. The only rule consistent with the progress of the age and its rapid improvements, is to leave such interests to honest competition. True, one ferryman may be injured by the enterprise of another. The building of one inn, in a village injures another. It is contrary to the genius of our institutions to foster monopolies, or "exclusive privileges but in consideration of public services," which are not insisted upon by the bill of complaint.

One other consideration in relation to this charter ubiquitous and omniverous according to its owner's construction of his rights. In the bill it is alleged that (plaintiff below) Sherman owned two ferries one half of a mile part, denominated the "Upper Ferry" and the "Lower Ferry," and that he procured the charter of the "Upper Ferry" to be granted by the legislature, which is perpetual. At the time, it will be seen by the bill, of the granting this charter to the "Upper Ferry," the "Lower Ferry" was then in existence, and had been for years previous. Here then was a charter granted to Sherman at his solicitation within one half of a mile of another ferry. It is further stated in the bill that but one of these ferries are necessary. It is insisted that the grant of the last charter to the second ferry is a contemporaneous exposition of these charters, and cannot be controverted by the grantee, because done at his request, and that the two acts show the legislature did not grant or intend to grant any exclusive privileges, admitting they possessed the power. It is true, as a general rule, that the legislative history of an act does not furnish a rule for its

exposition. This rule applies to public, not to private acts. Private statutes granting rights, are regarded in the nature of contracts, and the *res gestœ*—all the surrounding circumstances may be considered as explanatory of the intention of the contracting parties. *Blanhey* v. *Winstanly*, 3 T. Rep. 279; *Hunter* v. *Rice*, 15 East, Rep. 100; *Cook* v. *Booth*, Cowp. Rep. 819.

It may be conceded, so far as this cause is concerned, that a State may grant exclusive privileges to a corporation establishing a ferry, so as to exclude competition, but in this case they are not granted. It is only insisted upon by *implication*.

Although a State retains the power of eminent domain over a franchise, as a ferry and turnpike, as it does over homesteads, yet in this case there has been no exercise of that power over the first corporators' franchise. They are untouched, uninjured, and cannot be heard to complain.

*T. J. Wharton*, for defendant in error.

In the brief time allowed us for submitting an argument in this case it would be impracticable to attempt a reply to the elaborate brief filed by the opposite party, or even to notice the numerous authorities cited by them. Indeed, we think it would be a work of supererogation, if the fullest time were allowed for the purpose, to pursue the investigation through such an extended field. Surely there is nothing in the state of the case presented by the record which would make it necessary to enter upon a metaphysical argument of the distribution of power, under our form of government, in the several co-ordinate departments—legislative, executive, and judicial—or whether it is in virtue of the right of " *eminent domain*," that the legislature exercises the power which has been exercised by it in the various acts of incorporation specified in the bill in this case. Much less pertinent, in our view of the case presented by the record, is it to consider " whether the legislature or the courts are the judges of the necessity of an act of incorporation, or whether the opinion of the legislature as to the necessity may be reviewed by a court." We think the question presented is one of power—not of necessity or expediency of particular acts,—*power* in the legislature to have passed any of the other acts after the one

incorporating the first company.    Great public benefits were expected to result from the completion of the work which the company first incorporated were authorized to construct.    A very heavy expenditure of the private means of the corporators would have to be made in its construction.    The act of incorporation must be construed in law as a contract, securing certain benefits and immunities to the company as compensation for the work they were to perform and the money they would have necessarily to expend.    Let the power exercised by the legislature in the passage of that first act of incorporation result from what principle it may, whether inherent in that department of government in virtue of the assumed right of "eminent domain," or from its right, as the law making power, to pass any law for the promotion of the public interest or convenience, within the sphere of its constitutional powers, I care not, as it is not the source of its authority I seek to trace ; I only wish to insist that they exercised and exhausted all the power they possessed, *from any source,* in the passage of that first act; that from thenceforth, during the continuance of the period allotted by said act to the chartered existence of that company, they deprived themselves of the right or power to incorporate another company to effect the same object precisely, and in effecting it necessarily to interfere with, very materially, if not virtually destroy, the privileges and rights secured to the first company.    The primary object, we must suppose, with the legislature in passing said first act was to promote the public interest and convenience, in providing a safe and commodious highway,—facilitating travel and the transporting to market of the products of the country.    This was the public benefit to be conferred.    But as the labor and capital of the citizen cannot be seized to public use, and he be made a forced contributor of both to the public service, in the construction of public roads, turnpikes, bridges, &c., the secondary object is found in the compensating advantages offered to the corporators in the privileges and immunities afforded or secured to them by the act.    We say, therefore, that the charter granted the said first company is to be considered in the nature of a contract between the State, acting through its authorized agent, the legislature, and the corporators, and that the privileges secured by said charter to the latter are vested rights,

and that it is a breach of faith, nay, more, it is the exercise of power with which they had already parted, to confer upon another company, by a subsequent act, rights and privileges in the exercise of which they (the latter company) would impair or destroy those conferred upon the first.

That first act of incorporation imposed heavy penalties upon the parties acting under it, for non-performance of the corporate duties required of them, they were compelled to give bonds in heavy sums to keep the road and ferry in good repair during the period for which the company was incorporated : the rates of toll were restricted by the charter, and in return for all these liabilities imposed upon them they were supposed and intended to be compensated by the pecuniary benefits which would accrue from travel and transportation over their road.

In tracing the history of corporations, Chancellor Kent, says, " the various acts of incorporation of private companies for banking, manufacturing, and insurance purposes; for turnpike roads, and toll bridges, and for many other objects, upon which private industry, skill, and speculation, can be fairly and advantageously employed, constitute a mighty mass of charters, which occupy a large part of the volumes of the statute law. *All these incorporations are contracts between the government and the company, which cannot ordinarily be affected by legislative interference ;* and it has accordingly *been attempted to retain* a control other these private incorporations, by a clause now usually inserted in the acts of incorporation, that ' it shall be lawful for the legislature, at any time thereafter, to alter, modify, or repeal the act." 2 Kent. Com. (2nd ed.,) 272 ; and to the same point, see Ang. & Ames on Corp. *passim.*

But whether correct or incorrect in these general principles, as applicable to all incorporated companies of the character of the one we are considering, we insist, that in the *particular case,* presented by this record, there can be no doubt that the demurrer was properly overruled. The facts stated in the bill, and admitted by the demurrer, very clearly show a case in which it was competent for a court of equity to restrain the plaintiffs in error, by injunction, from interfering with, or using the road constructed or purchased by defendant, in connection with their own, as a medium

of travel and transportation. The bill shows *that some two miles, or more, of the road owned by defendant in error, and constructed under previous acts of incorporation, were used by persons travelling over the road of the plaintiffs in error, and that without passing through the toll gate erected on the road of the defendant, and without paying any toll to defendant;—and that plaintiffs in error had designedly, and in violation of the rights of the defendant, so constructed their road, that all persons passing over it would necessarily pass over two miles of the road of the defendant in error, without paying* him toll. The law certainly would not tolerate such a use of one's own rights as thus to abuse those of others; for it is a favored maxim of the law, *" sic ntere tuo, ut alienum non lœdas."* There are various other special grounds of equitable interposition and relief on behalf of the defendant, shown by the particular facts stated in the bill, which, apart from the general principles we have been considering, entitle the case to the favorable consideration of this court. We would therefore earnestly invite the attention of your Honors to the facts thus stated in the bill, even if you should wholly dissent from our views, as to the want of power in the legislature to pass the subsequent acts of incorporation in favor of the plaintiffs.

There is but a single other point to which we ask the attention of your Honors. . It is insisted in the brief of opposing counsel, which we find on file, that the defendant in error is estopped from setting up the want of power in the legislature to have passed the act for the benefit of the plaintiffs in error, because of its being an interference with vested rights under the first act of incorporation, as the bill shows that the defendant in error, holding under the first charter the *lower* turnpike and bridge or ferry, had purchased the *upper* turnpike and ferry from a company holding under an act subsequently passed; that this was an admission, (this act of purchase,) of power in the legislature to pass the second, and if the second, then any number of subsequent acts, incorporating any number of companies, &c. Surely, there is no force in any such position. Suppose that was the opinion of the defendant when he made that purchase, it is not worthy of notice by this court, when he stands before it to demand an adjudication of his

rights, not according to his own view of them, but upon the principles of law and equity, by which courts are governed in their decisions.

It is not unreasonable that he should have desired, after investing his means so largely in the enterprise, to remove competition; but when he found, after his purchase of the rights and privileges of that second company, that another was chartered, he discovered that he was engaged in a conflict with the hydra, and determined at once to make his appeal to the forum of justice, and abide the judicial decision of his rights.

*F. M. Aldridge*, in reply.

We have not been favored with the argument of counsel for the defendant in error, except the brief heretofore filed, which is principally upon the appeal bond, the validity of which has been decided on the motion to dismiss. The points presented therein we propose to consider, not having the benefit of examining others that may be presented in the brief hereafter to be filed.

We do not desire, and will not pass over the ground, heretofore touched by us in our first argument. We do not see that any position taken by us, has been weakened, either by the authorities cited or by the reasoning of counsel.

The remark of Chancellor Kent, referred to in the brief on file, in relation to corporations, was general and historical in its character, rather than enunciatory of legal principles. We have already shown that there is a wide distinction in the character of corporations there named. The grant of *right of way* to a corporation, involves the exercise of the right of eminent domain, and is entirely different from insurance corporations, &c. We do not deny there may be found *expressions*, which seem to be hostile to the positions assumed by us. Mr. Justice Story uses them in his works, and in his dissenting opinion in the case of *The Charles River Bridge* v. *The Warren Bridge*, 11 Peters, 380.

The great and entire current of authorities are with us, and all the reasoning, as will be seen by the opinion of Chief Justice Taney, in the case above referred to. Indeed we know of no case against this doctrine—*not one.*

It is, however, contended that in this cause there are some alle-

gations in the bill which save it from the general rule, and the well settled principles in such cases. Before an examination of these points, let us refer to one fact in the bill of complaint, which seems to strike the adverse counsel with some force. It is alleged that Collins and others did not lay out their road as required by their charter ; that they did not select as a landing place on the south side of the Yalobusha river, the point where Main street intersects the river, as required by the Act of ∙Incorporation of 1852, page 294. This, however, is not a ground of complaint in the bill. The bill recites further, that Collins and others procured another act to be passed 11th of March, 1856, and this act authorized as it will be seen, the road where it was located or might be located. All of this occurred before the filing of the bill, and is a part of it. It will be seen also, that the location of the road in the wrong place is not a cause of complaint, where the grievances are enumerated and specifically set out. The difficulty originated from the union of the two towns, and two main streets, which led to be obviated by the last act, and hence is not a matter of complaint in the bill, except the allegation that the charter was procured by fraud.

The bill further states in its narration, that defendant in error sustained damages in the summer of 1855, between the passage of these acts; but this is not a matter proper for consideration, in a bill for an injunction.

Now, as to the allegations, which bring this case out of the general rule, which occur in the narrative part of the bill :—

1. That persons *could* use the road of Sherman, and then cross at the ferry of Collins and others. It will be observed that the bill does not allege that any person had ever so travelled, or that Collins and others were willing to it, or in any way induced it. It is merely a remote contingent probability, or (I may say,) possibility. If it were true, and the fact directly charged, the case would be identical with the case of the *Stourbridge Canal* v. *Wheeley et al.*, 2 Barn. & Ald. 793, cited in 11 Peters, 544. It is the duty of defendant in error to enclose his road, or he holds it subject to slight depredations, which do not amount to a trespass. *Vicksburg & Jackson Railroad Co.* v. *Patton.* See Opinion Book.

2. The other allegation of the bill which it is insisted, withdraws this case from the general rule is, that the plaintiffs in error's road runs south one mile, parallel with, and within *ten feet* of defendant's road. He further says, he would be justified in saying the roads actually touch each other, along that distance, which, however, he did not say, after weighing the responsibility of an oath, although he weighed the question of justification. It will be observed it is not anywhere charged, or intimated, that Collins and others appropriate one foot of soil necessary, or claimed to be necessary to Sherman, in the enjoyment of his franchise, *nor do they use one foot of soil in common.*

It is further alleged that Collins and others' road is drained by Sherman's ditch. It is not, however, pretended that the ditch is less capable of draining Sherman's road, or that it in any way injures him.

Admitting it to be true, for the purpose of this argument, that persons who cross at the ferry of Collins and others, travel a short distance on the road of Sherman, but that it is not necessary for them to do so, for the bill shows Collins has a road to the full length of Sherman's, can it be said, Collins and others are responsible for trespasses committed by others without their procurement or assent? Would the court enjoin A. at the suit of B. from going to Canton, because A., when he goes to Canton, travels in cars, and passes over B.'s land, to whom the railroad company refuse to pay damages? Would a court enjoin Collins and others from having and using a road otherwise legal, because persons who sometimes travel their road trespass upon an adjoining road? No such ground of injunction or of right was ever contemplated in the bill—it is a mere after-thought.

Yet it is insisted that Collins and others' road is drained by Sherman's ditch, and that Collins is a trespasser! The proposition does not require argument. If A. and B. own wild lands adjoining each other, and A. clears ditches and reduces his into cultivation, and the ditch is near their line, can A. enjoin B. from clearing and cultivating his land because B. is incidentally benefited by the acts of A., prompted by his own self-interest? The statement of the proposition is its refutation. It is not charged in the

bill that the ditch cut by Sherman is less capable of draining his road because it drains the other road, the ditch being for drainage generally of the land, whether used for a road or for cultivation.

But to consider these questions, sprung here for the first time, upon more general principles—admitting all true, that persons do pass over Sherman's road and then cross at Collins's ferry, notwithstanding the bill shows the road and ferry-boat was just complete and *about to go* into operation, and that the ditch cut by Sherman drains Collins's road; admit further, for argument, that it is thereby less capable of draining Sherman's road, would a suit in equity or an injunction be the proper remedy? The supposed danger to the property of complainants does not render this a proper case for the interposition of the extraordinary power of a Court of Chancery. The principles upon which the court should proceed in granting or refusing relief by injunction in cases of this kind are correctly laid down by Lord Brougham in a recent case of the *Earl of Risson* v. *Hobart*, Cooper, Rep. (temp. Brougham,) 343. "If anything sought to be prohibited is in itself a nuisance, the court will interfere to stay irreparable mischief, where the *complainant's right is not doubtful*, without waiting for the result of a trial. But where the thing sought to be restrained is not in itself noxious, but only something which may according to circumstances prove to be so, the court will refuse to interfere until the matter has been tried at law by an action." *The Mohawk Bridge Co.* v. *The Utica and Schenectady Railroad Co.*, 6 Paige, 563; *Livingston* v. *Livingston*, 6 John. Ch. Rep. 497; *Corporation of New York* v. *Masses*, Ib. 49; *Whitfield* v. *Rogers*, 4 Cush. (Miss.) 26, 84.

This objection, it is true, could be urged to the whole bill, but we do not insist on it, except as to these grounds, and others of similar character that may be urged in brief to be hereafter pleaded by defendant's counsel, as we are anxious for a decision of the great principles involved in this cause, which are necessary to determine the rights of the parties litigant. The question is one of great public interest, and we can but regret that our discussion of it has not been adequate to the important interests involved.

HANDY, J., delivered the opinion of the court.

The substance of this case is as follows:—In the year 1836, the legislature passed an act incorporating the Grenada Bridge and Turnpike Company, with power to construct a bridge across the Yalobusha river opposite the town of Grenada, and a turnpike road leading therefrom; to receive tolls for passage and transportation at specified rates; the location of the road and bridge to be fixed by the directors first chosen; and it was made the duty of the company to keep the road and bridge in constant repair, out of the profits arising from the tolls. The work was completed, and afterwards the bridge being destroyed by freshets, an act was passed by the legislature in 1848, authorizing the company to establish a ferry in lieu of the bridge. The complainant became the proprietor of the road and ferry in 1853, by purchase from the company. About the time this ferry was established, another ferry and road were established by certain individuals under authority of the Board of Police of the county, about a half mile above the first ferry. This latter ferry and road were purchased from the proprietors by the complainant and another individual, who in January, 1852, obtained an act of incorporation from the legislature, authorizing them to keep up the ferry and turnpike, to receive tolls, and fixing their location, and making it their duty to keep the road and ferry in constant repair, and the complainant afterwards became the sole proprietor by purchase. This charter extended to the year 1870, and the former one extended to the year 1860.

The bill alleges, that whilst these improvements were in operation and well kept, and more than sufficient to supply the public wants, the defendants combined and fraudulently procured an act to be passed by the legislature in March, 1852, incorporating them as a company to establish another ferry across the same river at Grenada, and a turnpike; under which, in the year 1855, they established a crossing-place about one hundred yards above the first ferry of the complainant, and made a road leading out parallel with and between the complainant's two roads, and for a considerable distance running within ten feet of one of them, so that persons crossing at the defendant's ferry could use the lower road and

bridges of the complainant, without paying toll, unless constantly watched; that the road and ferry of the defendants not being in conformity to the act incorporating them, they obtained another act by false representations, at the January session 1856, and by these means they are preparing their ferry and road for custom, greatly to the injury of the complainant, and in violation of his chartered privileges. The bill prays an injunction against the defendants from the use of their road, &c.

The defendants answered, and denied so much of the bill as charges fraud, and demurred to the residue; the demurrer was overruled, and the defendants thereupon bring the case here.

Before proceeding to consider the true question arising upon this bill, it is necessary to notice some of its statements which are urged as showing ground of equitable relief, apart from the main point on which the bill is founded.

These statements are, that the defendants' road was constructed very near to one of the complainant's roads, for a considerable distance, and that persons crossing at the defendant's ferry could use the complainant's road and bridges without paying toll. It is not alleged that any part of the complainant's road is encroached upon or appropriated by the defendants, or that the defendants in any manner disturb the actual possession and use of the complainant's road. The allegation in substance is, that the defendants' road runs very near to the complainant's, and that persons crossing at the defendants' ferry and paying them toll, *may* make use of the complainant's road without paying him toll, unless a strict watch is kept.

These statements do not appear to have been introduced as a substantive ground of relief, and certainly they are insufficient for that purpose. The proximity of the defendants' road to that of the complainant, would be no ground of complaint in law, if the defendants did not actually invade the possession of the complainant's road; much less would it be any ground for hindering the defendants in the use of their chartered right, that *other persons* passing their ferry *might* commit a trespass upon the complainant's property. If such trespass were even committed by the

defendants, it would be no ground of relief in equity, by restraining the defendants from the exercise of their legal rights.

But the real ground on which the complainant's equity is placed, is the infringement of his chartered rights by the defendants, in virtue of the powers claimed by them under their act of incorporation ; and this presents the question whether that act of the legislature was constitutional, with reference to the powers and privileges previously granted by the acts of incorporation of the complainant's companies.

It is said that these prior charters were contracts between the State and the grantees, which the State could not violate or impair by reason of the prohibitions of the Constitution of the United States. This is true. To the extent of the powers and privileges specially granted, and of the restrictions upon the general powers of the State contained in these charters, such provisions being within the constitutional competency of the legislature, would be binding and inviolable. But what is the extent of the immunities granted ? They are very few and simple. First, the companies are incorporated by corporate names, with power to construct the contemplated works. Then they are required to keep them in repair by the tolls, and the periods of their corporate existence are fixed. The object of their creation was to promote the public convenience, and to enlarge the facilities for travel, and the transportation of the products of the country. The subsequent grant to the defendants was for the same purpose.

It is not sufficient that the charters under which the complainant claims were contracts ; but it must appear that exclusive privileges were thereby granted, which the legislature had not power to infringe by any subsequent act granting the same rights to others. If there be no such grant of exclusive privileges, it must be presumed that the legislature, in making the grant, intended to retain all the power over the subject-matter of it which they possessed, when the charter was granted. And the doctrine is now well settled, that exclusive privileges in grants to corporations cannot be founded on implication, and that the corporation can claim nothing that is not clearly specified in the grant or embraced in its spirit. The retention of the power by the State, is for the public benefit, to be

exercised to that end whenever the State may deem it expedient; and, therefore, she is never held to be precluded of its exercise, except by a plain and manifest intention apparent in the grant. *Beatty* v. *Knowles*, 4 Peters, 168; *Providence Bank* v. *Billings*, Ib. 514; *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420, 547.

It is, therefore, incumbent on the party claiming the grant of an exclusive privilege under an act of incorporation, to show that it is clearly conferred by the charter, and that it was intended thereby that the State should preclude herself of the power to make grants to others which might impair the benefits accruing to the first corporation. If the exclusive right be not clearly granted, he has no reason to complain that the legislature has thought fit, in order to promote the welfare and convenience of the community, to exercise the power which it has retained, and confer powers upon other corporations which may render the enjoyment of the first grant less valuable. It was subject to that condition that he thought fit to accept the grant, and it must, of course, be held in subordination to the power over the subject-matter, reserved to the public and to be exercised by the legislature. It is but one of the numerous cases in which individual interest and advantage must yield to the public good; and the hardship and loss occasioned by the power over the subject reserved by the State, are but the result of the tacit agreement which he made with the State in accepting the grant.

In the charters under which the complainant claims, there is nothing to bind the State to a grant of exclusive privileges, either in the terms or in the objects of the charters. It is said, that the companies and the complainant who succeeds to their rights and duties, are required to keep the works in constant repair, and as a compensation for that, they were allowed the pecuniary benefits arising from travel and transportation over the road, and that their rights, in that respect, cannot be infringed by granting charters to other persons embracing the same objects.

But this is not to be regarded as a guaranty of an *exclusive right* to these companies. It is a *duty* imposed upon them by their charters, as a condition to the enjoyments of the rights granted,

so long as they continue to use them. But they may at any time abandon the franchise and surrender the charters, in which event, they would be under no obligation to keep the works in repair, and liable to no penalty for their failure to do so. It would simply be a ground of forfeiture of the charters, and it cannot be held even to imply an obligation on the part of the State, that the companies should have the exclusive enjoyment of the rights granted to them, as a consideration for an obligation on their part to keep the works in "constant and thorough repair." This is still more manifest, from the fact that the first charter provides that the work shall be kept in repair from the tolls; thereby showing that this duty was only to be performed so long as the company thought fit to use the privileges granted to them.

We think it manifest, that there is nothing in the charters under which the complainant claims, which debarred the State from the exercise of her sovereign right to grant similar privileges to other persons, and that the charter granted to the defendant is not such an infringment of the franchises of the complainant, as to render the act unconstitutional and void.

The contrary view being the foundation of the relief sought in the bill, it follows that it cannot be maintained.

The decree is reversed, the demurrer sustained, and the cause remanded for further proceedings upon so much of it as depends upon the charge of fraud, which is denied by the answer.